[Cite as *State v. Phillips*, 2014-Ohio-5162.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 14AP-79 |
| v. | : | (C.P.C. No. 12CR-07-3644) |
| Malcolm Phillips, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 20, 2014

*Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee.

*Robey & Robey*, and *Gregory Scott Robey*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

SADLER, P.J.

{¶ 1} Defendant-appellant, Malcolm Phillips, appeals from the judgment of the Franklin County Court of Common Pleas convicting him, following a jury trial, of possession of cocaine with an accompanying firearm specification and having a weapon while under disability ("WUD"). For the following reasons, we affirm.

I. BACKGROUND

{¶ 2} On July 20, 2012, appellant was indicted on one count of possession of cocaine in an amount equal to or exceeding 100 grams, in violation of R.C. 2925.11, a first-degree felony, with an accompanying one-year firearm specification, in violation of R.C. 2941.141, and one count of WUD, a third-degree felony, in violation of R.C. 2923.13.

{¶ 3} On May 9, 2013, appellant filed a motion to suppress evidence obtained during a traffic stop occurring in the early morning hours of February 3, 2012. Following a June 11, 2013 hearing, the trial court denied that motion in a written decision issued July 9, 2013. On October 7, 2013, appellant filed a motion to suppress evidence obtained during a search of his home on January 31, 2012, evidence obtained during a search of his rented public storage unit on the afternoon of February 3, 2012, and oral statements made to law enforcement officers following his arrest on February 3, 2012. In a supplemental brief filed October 31, 2013, appellant challenged the canine sniff of his public storage unit as unconstitutional. On November 12, 2013, appellant filed a motion to suppress evidence obtained following a traffic stop occurring immediately prior to the search of the storage unit on February 3, 2012, and oral statements made to officers following his February 3, 2012 arrest. Following a hearing on December 9, 2013, the trial court orally denied the October 7 and November 12, 2013 motions.[1]

{¶ 4} The case thereafter continued to trial before a jury, following which the jury returned verdicts finding appellant guilty as charged in the indictment. The trial court sentenced appellant to 11 years for the cocaine possession, consecutive to 1 year on the accompanying firearm specification. The court imposed a 12-month sentence for the WUD and ordered that it be served consecutively to the 12-year sentence imposed on the cocaine possession and firearm specification.

## II. ASSIGNMENTS OF ERROR

{¶ 5} In a timely appeal, appellant sets forth 11 assignments of error for our review:

> [I.] The Trial Court erred in denying Appellant's first Motion to Suppress Evidence regarding the search of Appellant's vehicle on February 3, 2012, at approximately 1:30 am.
>
> [II.] The Trial Court erred in denying Appellant's second Motion to Suppress Evidence regarding the search of the home on January 29, 2012.

---

[1] On appeal, appellant does not challenge the denial of the motions as to the oral statements made to police officers on February 3, 2012.

[III.]   The Trial Court erred in denying Appellant's second Motion to Suppress Evidence regarding [s]earch of the storage unit on February 3, 2012.

[IV.]   The Trial Court erred in denying Appellant's Motion to Suppress Evidence relating to the warrantless stop and search of his motor vehicle at the storage unit on February 3, 2012.

[V.]    Trial counsel provided ineffective assistance in failing to challenge the legality of the traffic stop of Appellant, and in failing to challenge the qualifications of the canine and handler, relating to the traffic stop and search of Appellant's vehicle on February 3, 2012.

[VI.]   The Prosecutor engaged in misconduct by improperly commenting on Appellant's decision to remain silent which deprived him due process of law and a fair trial.

[VII.]  The evidence presented was insufficient as a matter of law to sustain a conviction.

[VIII.] The verdict was against the manifest weight of the evidence.

[IX.]   The Trial Court committed critical errors in the trial and the cumulative effect denied Appellant due process of law and a fair trial.

[X.]    The Trial Court erred by giving instructions on flight and aiding and abetting, and by failing to give Appellant's theory of defense instruction.

[XI.]   The Trial Court erred in imposing consecutive sentences on counts one and two.

## III.  DISCUSSION

### A. First, Second, Third, and Fourth Assignments of Error–Motions to Suppress

{¶ 6}   As appellant's first, second, third, and fourth assignments of error challenge the denials of his motions to suppress, we first set forth the applicable standard of review. "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of fact finder and, accordingly, is in the best

position to resolve factual questions and evaluate witness credibility." *Columbus v. Body*, 10th Dist. No. 11AP-609, 2012-Ohio-379, ¶ 9, citing *Burnside* at ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "As such, an appellate court must accept the trial court's factual findings if they are supported by competent, credible evidence." *Id.*, citing *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). "Accepting these facts as true, the reviewing court must then independently determine, without deference to the trial court's conclusion, whether the facts satisfy the applicable legal standard." *Id.*, citing *Burnside* at ¶ 8, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997). With this standard in mind, we address appellant's individual assignments of error.

### 1. First Assignment of Error

{¶ 7}   Appellant's first assignment of error challenges the denial of his motion to suppress related to the traffic stop occurring in the early morning hours of February 3, 2012. Specifically, appellant claims he was detained beyond the time justified for the traffic stop in violation of his rights under the Fourth Amendment to the United States Constitution.

{¶ 8}   At the suppression hearing, plaintiff-appellee, State of Ohio, presented the following evidence. At approximately 1:26 a.m. on February 3, 2012, Officer Clayton Adams of the Whitehall Police Department ("WPD") was on routine patrol when he observed a vehicle with a malfunctioning rear license plate light. Adams was familiar with appellant and his vehicle from previous traffic stops in which drugs and/or drug paraphernalia were found. After checking the vehicle's license plate number through LEADS, Adams confirmed appellant's identity as the vehicle's owner. He then initiated a traffic stop and subsequently obtained identification from both appellant and the driver, Bruce Wiggins. Adams returned to his cruiser and radioed the information to a police dispatcher in order to determine the validity of the identifications and whether either of the occupants had any outstanding arrest warrants. Around this time, WPD Officer John Slosser arrived at the scene.[2]

---

[2] There is some dispute as to when Slosser arrived at the scene. Computerized WPD records indicate he was "dispatched" at 2:06 a.m. However, Adams testified that the WPD records were inaccurate and that Slosser arrived at the scene within moments of his own arrival.

{¶ 9} While awaiting a response from the dispatcher, Adams approached the vehicle and asked the occupants for permission to search it. After the occupants refused consent, Adams returned to his cruiser. Approximately five to ten minutes after initiating the identification/warrant check, Adams learned that neither occupant of the vehicle had any outstanding arrest warrants. He then began writing a traffic citation for Wiggins for the malfunctioning rear license plate light. Based on his previous encounters with appellant and information obtained through a LEADS search, Adams suspected that the vehicle might contain drugs; accordingly, at approximately 1:33 a.m., he summoned a Columbus Police Department ("CPD") canine unit to the scene. The canine unit received the request at 1:34 a.m. While awaiting the arrival of the canine unit, Adams continued writing the traffic citation.

{¶ 10} The canine unit arrived at the scene at 1:41 a.m. At that time, Adams had not yet completed the traffic citation. The canine handler directed Adams and Slosser to remove appellant and Wiggins from the vehicle. The narcotics canine sniffed around the vehicle's perimeter and immediately "alerted to the passenger side door." (June 11, 2013 Tr. 27.) Adams arrested appellant and, pursuant to a pat-down search, discovered a business card for a public storage facility. A subsequent search of the vehicle revealed a plastic baggie with less than one gram of cocaine, a digital scale, marijuana crumbs, and plastic baggies. Adams issued a traffic citation to Wiggins and then released him and appellant's vehicle. Adams thereafter transported appellant to the police station.

{¶ 11} Slosser testified that, during the year preceding the incident on February 3, 2012, he was involved in three traffic stops involving appellant and drugs and/or drug paraphernalia, and he often discussed these encounters with Adams. On the night of the incident, he heard Adams radio his intention to stop appellant's vehicle. Because he was in the area, he drove to the scene to assist Adams.[3] Slosser corroborated Adams' testimony regarding the identity/warrant checks of the occupants, the occupants' refusal to consent to a search of the vehicle, and the request for a canine unit due to prior drug incidents involving appellant. According to Slosser, the canine unit arrived approximately ten minutes after Adams submitted the request.

---

[3] Slosser also testified that WPD records inaccurately identified his arrival time as 2:06 a.m.

{¶ 12} On cross-examination, Slosser testified that appellant and Wiggins were held at the scene so that Adams could write the traffic citation for Wiggins while at the same time await arrival of the canine unit. Slosser averred that he did not remember how long it took Adams to write the citation; however, he averred that the physical process of writing a traffic citation typically takes no longer than two or three minutes.

{¶ 13} On redirect examination, Slosser explained that police procedures ancillary to the physical citation-writing process may extend the time for issuing a citation well beyond two or three minutes. By way of example, Slosser averred that police officers check for outstanding arrest warrants while writing citations, a process which sometimes takes "quite a while" due to inaccuracies in police computer databases. (June 11, 2013 Tr. 57.) On recross-examination, Slosser testified that he could not recall whether he and Adams discovered that neither appellant nor Wiggins had any outstanding arrest warrants before or after the canine unit arrived.

{¶ 14} In his motion to suppress, appellant did not challenge the validity of the traffic stop for the malfunctioning license plate light.[4] Appellant argued that the traffic stop was unlawfully prolonged because it lasted longer than was reasonably necessary to identify the occupants of the vehicle, determine if they had any outstanding arrest warrants, and issue the citation for the traffic violation. Appellant contended that the traffic stop converted to a detention when the officers removed appellant and Wiggins from the vehicle when the canine unit arrived and that the officers had no reasonable suspicion to justify such detention. In response, appellee argued that the traffic stop was not unlawfully prolonged, as a maximum of 20 minutes elapsed between the time of the stop and the time the canine unit arrived. Appellee further contended that, even if the traffic stop lasted long enough to convert to a detention, the officers had reasonable suspicion to justify it, based on their prior interactions with appellant and his vehicle.

{¶ 15} In its July 9, 2013 decision denying appellant's motion, the trial court factually determined the traffic stop began at 1:26 a.m., Adams called for the canine unit at 1:33 a.m., and the canine unit arrived at 1:41 a.m. These factual conclusions are supported by the record. The court found:

---

[4] Trial counsel's failure to contest the validity of the traffic stop is the subject of appellant's fifth assignment of error, which we address infra.

> [S]eventeen minutes is a permissible amount of time in which to have handled the situation and have it remain a traffic stop. This is based upon the time needed, per the testimony, to do the things listed above: to permit the officer to go from his cruiser to the car in question, to determine the status of the occupants, car, and license tag as well as writing any traffic summons and/or requesting a consensual search. This determination, based on the testimony in this case, allows ten minutes for the computerized searches through the dispatcher to take place, three minutes to write out the traffic ticket, two minutes to go back and forth from cruiser to the suspect['s] car, and a minute or two to discuss the consensual search issue. Since there was no apparent interference by the Defendant or the driver in this incident, the time period is not lengthened.

(July 19, 2013 Decision and Entry, 5.) Based on the foregoing, the court held that "the time period of fifteen minutes from the initial stop until the arrival of the K-9 unit is not so unreasonable in this instance as to turn the traffic stop into a detention." (July 19, 2103 Decision and Entry, 5.)

{¶ 16} "It is well-established that stopping an automobile, thus temporarily detaining its occupants, constitutes a seizure under the Fourth Amendment to the United States Constitution." *State v. Dorsey*, 10th Dist. No. 04AP-737, 2005-Ohio-2334, ¶ 17, citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Further, "the seizure of a person without the authority of a warrant is per se unreasonable, and therefore unconstitutional, unless an exception applies." *Id.,* citing *Katz v. United States*, 389 U.S. 347, 357 (1967). "One such exception is commonly known as an investigative or *Terry* stop." *Id.,* citing *Terry v. Ohio*, 392 U.S. 1 (1968).

{¶ 17} Applicable to automobile seizures, the *Terry* exception permits a police officer to stop an individual if the officer, based on specific and articulable facts, has reasonable suspicion of criminal activity. *Id.* at ¶ 18, citing *Terry*; *Prouse* at 654. "No warrant is required to initiate a traffic stop if the police officer harbors a reasonable suspicion that a driver has violated a traffic law." *Id.,* citing *Columbus v. Stanley*, 10th Dist. No. 00AP-1128 (June 28, 2001).

{¶ 18} However, "a traffic stop must comply with the Fourth Amendment's general reasonableness requirement." *State v. Aguirre*, 4th Dist. No. 03CA5, 2003-Ohio-4909,

¶ 33, citing *Whren v. United States*, 517 U.S. 806, 809 (1996). "The scope and duration of a routine traffic stop 'must be carefully tailored to its underlying justification * * * and last no longer than is necessary to effectuate the purpose of the stop.' " *Id.* at ¶ 35, quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983).

{¶ 19} "When a law enforcement officer stops a vehicle for a traffic violation, the officer may detain the motorist for a period of time sufficient to issue the motorist a citation and to perform routine procedures such as a computer check on the motorist's driver's license, registration and vehicle plates." *Id.* at ¶ 36, citing *State v. Carlson*, 102 Ohio App.3d 585, 598 (9th Dist.1995). " 'In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.' " *Id.*, quoting *Carlson* at 598.

{¶ 20} "A canine sniff by a drug detection dog of the exterior of a vehicle lawfully detained for a traffic stop does not implicate Fourth Amendment rights." *State v. Greene*, 2d Dist. No. 25577, 2013-Ohio-4516, ¶ 22, citing *Illinois v. Caballes*, 543 U.S. 405 (2005); *State v. Ramos*, 155 Ohio App.3d 396, 2003-Ohio-6535 (2d Dist.). "Police are not required to have reasonable suspicion that a vehicle contains drugs prior to conducting a canine sniff of the vehicle during a traffic stop, so long as the duration of the traffic stop is not extended beyond what is reasonably necessary to resolve the issue that led to the stop and issue a traffic citation." *Greene* at ¶ 22, citing *Ramos*. "If, however, the duration of the traffic stop is extended in order to bring a drug sniffing dog to the scene, police must have a reasonable suspicion that the vehicle contains drugs in order to justify the continued detention." *Id.*, citing *Ramos*, citing *State v. Kuralt*, 2d Dist. No. 20532, 2005-Ohio-4529, ¶ 10-11.

{¶ 21} In the present case, after evaluating the duration of the stop in light of the totality of the circumstances and considering whether Adams diligently conducted his investigation, we conclude the evidence supports the trial court's finding that the traffic stop was not unlawfully prolonged. The canine sniff occurred before Adams completed writing his citation and only 15 minutes after the traffic stop began, within the normal time for processing and issuing a traffic citation for a malfunctioning license plate light. There is no evidence that the traffic stop for that violation was extended by or for the

purpose of the canine sniff. Less than 20 minutes elapsed from the initial stop to the canine alerting to the vehicle. Once the canine alerted to the scent of drugs in the vehicle, police had probable cause to search the vehicle and appellant's person. *Id.* at ¶ 24, quoting *State v. Pryor*, 2d Dist. No. 20800, 2005-Ohio-2770, ¶ 13 ("It is 'settled that when a trained narcotics dog alerts on a lawfully stopped vehicle, an officer has probable cause to search the vehicle.' "). Accordingly, we find that appellant's Fourth Amendment rights were not violated and the trial court properly overruled his motion to suppress the evidence obtained as a result of the traffic stop.

{¶ 22} The first assignment of error is overruled.

### 2.  Second Assignment of Error

{¶ 23} In his second assignment of error, appellant challenges the denial of his motion to suppress evidence found during a search of his home on January 31, 2012. Appellant claims that the search was based on a warrant supported by an affidavit that contained material misstatements and omissions and that the warrant facially lacked probable cause. Specifically, appellant argues that the affidavit supporting the search warrant omitted important details about an anonymous tip and erroneously stated that appellant was arrested twice in 2011 on felony drug charges. He further maintains that the four corners of the search warrant do not demonstrate probable cause.

{¶ 24} At the suppression hearing, appellee presented the following testimony and evidence. Detective Tye Downard, a narcotics officer with the Reynoldsburg Police Department ("RPD"), testified that he and RPD Sergeant Shane Mauger "worked * * * together" to prepare the affidavit for the search warrant executed at appellant's home on January 31, 2012. (Dec. 9, 2013 Tr. 9.) Downard identified the search warrant and accompanying affidavit. That affidavit, signed by Mauger, contains the following factual averments.[5]

{¶ 25} On January 25, 2012, Mauger received an anonymous tip that appellant and Andrea McWhorter were selling narcotics from a residence located at 5903 Little Brook Way. On January 26, 2012, Mauger drove to the address and obtained vehicle registration information from two vehicles parked at the residence. A subsequent computer search revealed the vehicles were registered to appellant and McWhorter.

---

[5] Personal issues prevented Mauger from attending the hearing.

{¶ 26} Another computer search revealed that appellant was arrested by the RPD twice in 2011 for felony drug crimes. A broader criminal history revealed that appellant had been charged with "Drug Paraphernalia, OVI, Protection Order violation, drug abuse (crack), Weapons while under disability, and trafficking in drugs." (Mauger Search Warrant Affidavit, 2.)

{¶ 27} While conducting a computer search on McWhorter, Mauger discovered that she was the subject of an investigation by Deputy Michael Kemmerling of the Vinton County Sheriff's Office ("VCSO"). Mauger contacted Kemmerling, who informed him that he had been told by McWhorter's minor daughter that she had recently run away from her mother's residence with $11,000 in cash she found in her mother's dresser. The girl also told Kemmerling that appellant sold drugs from the residence and the $11,000 she took was proceeds from those drug sales. Mauger later confirmed through missing person reports McWhorter had filed with the CPD that she resided at 5903 Little Brook Way.

{¶ 28} On January 27, 2012, Mauger conducted a trash pull at 5903 Little Brook Way, during which he found several ripped plastic baggies wrapped in black electrical tape. One of the plastic baggies contained a small white substance which was field tested and determined to be cocaine.

{¶ 29} At the suppression hearing, Downard testified that the information contained in the affidavit regarding appellant's 2011 felony arrests stemmed from an RPD computer search which revealed (1) an RPD detective utilized an undercover informant to purchase crack cocaine from appellant in 2011, and (2) an RPD officer arrested appellant in 2011 for possession of marijuana and drug paraphernalia. On cross-examination, Downard conceded that he did not physically prepare the search warrant affidavit and had no detailed personal knowledge about either the anonymous tip or the trash pull. He further conceded that neither of appellant's 2011 arrests were for felonies.

{¶ 30} Following presentation of its evidence, appellee argued that, even if the portion of the search warrant affidavit as to the alleged factual misstatement regarding appellant's two felony drug arrests was excised, the remaining factual averments sufficiently established probable cause justifying issuance of the warrant. In response, appellant argued that the material misstatement in the affidavit regarding appellant's 2011 felony arrests was made in bad faith and that the remaining factual allegations in the

affidavit did not sufficiently establish probable cause. In particular, appellant argued that neither the undetailed, "bare bones" anonymous tip nor the drug residue retrieved from the trash pull, having been field tested rather than lab tested and having not been definitively determined to have come from trash at appellant's residence, was sufficient to establish probable cause. (Dec. 9, 2013 Tr. 39.)

{¶ 31} The trial court found that the misstatement regarding the felony drug arrests in 2011 was, at worst, negligent or reckless, rather than deliberate or intentional, and, in any event, was not material given that the factual averments regarding appellant's broader criminal history included felony charges which may have occurred in 2011. The trial court further found that a reasonable inference could be drawn that the drug residue discovered during the trash pull came from appellant's residence. Having so found, the trial court concluded there was probable cause to issue the warrant for appellant's residence and overruled the motion to suppress.

{¶ 32} In determining whether an affidavit submitted in support of a search warrant demonstrates probable cause, " '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v. George*, 45 Ohio St.3d 325 (1989), paragraph one of the syllabus, quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). Further, "reviewing courts [including a trial court conducting a suppression hearing as well as appellate courts] may not substitute their own judgment for that of the issuing magistrate by conducting a *de novo* determination as to whether the affidavit contains sufficient probable cause upon which the reviewing court would issue the search warrant." *Id.* at 330. Rather, "under the totality-of-the-circumstances of *Gates*," the issue before the court is whether an affidavit provides a substantial basis for the magistrate's conclusion that there was a fair probability that contraband would be found in the location subject to the search warrant. *Id.* "[T]he focus of the probable cause inquiry is the *totality of the circumstances* presented in the affidavit, not each component standing alone." (Emphasis sic.) *State v. Robinson*, 7th Dist. No. 10 CO 37, 2011-Ohio-6639, ¶ 23. A reviewing court should "accord great deference to the magistrate's determination of

probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *George* at paragraph two of the syllabus, citing *Gates.*

{¶ 33} Upon review of the affidavit, we agree with the trial court that the information provided by Mauger was sufficient for the municipal court judge to issue the search warrant. We note initially that appellant points to no evidence demonstrating that Mauger's misstatement about the two felony drug arrests in 2011 was made in bad faith. Indeed, the only evidence as to Mauger's veracity was provided by Downard, who testified that he had worked with Mauger for many years and had no reason to believe that he would intentionally include false information in a search warrant affidavit. Further, the affidavit includes information regarding other drug charges brought against appellant, against which appellant poses no challenge.

{¶ 34} As to the alleged omission of details about the anonymous tip, we note that the "veracity, reliability and basis of knowledge [of an anonymous informant] are all highly relevant in determining probable cause." *State v. Pustelnik*, 8th Dist. No. 91779, 2009-Ohio-3458, ¶ 22, citing *Gates.* Thus, " '[t]here must be some basis in the affidavit to indicate the informant's credibility, honesty or reliability.' " *Id.*, quoting *State v. Harry*, 12th Dist. No. CA2008-01-013, 2008-Ohio-6380, ¶ 20. However, "a deficiency in one of these principles does not negate probable cause if there is a strong showing on another or if there is some other indicia of reliability." *Id.*, citing *Gates.* Even where there is an absence of evidence in an affidavit to demonstrate an affiant's prior knowledge of the veracity of a confidential informant, corroboration of the informant's statements by police investigation can provide "sufficient indicia of the reliability and veracity of the informant's statements." *Id.* at ¶ 23. *See also State v. Ross*, 6th Dist. No. L-96-266 (Jan. 16, 1998) ("Even in cases involving anonymous informants, a tip is sufficient where certain important or key elements of the tip are corroborated by police observation or investigation."); *State v. Goddard*, 4th Dist. No. 97CA23 (Oct. 2, 1998) (while affidavit was lacking in showing a basis for anonymous informant's knowledge and in establishing his veracity, the corroborating efforts by police officers made search constitutional).

{¶ 35} In the present case, Mauger corroborated the anonymous tip when he went to the residence, verified that one of the vehicles parked there was registered to appellant, and learned through computer searches that appellant had previously been charged with

several drug-related crimes, including drug trafficking.  In addition, during the trash pull conducted at the residence two days after receiving the anonymous tip, Mauger discovered a plastic baggie containing cocaine.

{¶ 36} The affidavit included additional corroborating information in the form of the report from the VCSO regarding McWhorter's daughter's statement that appellant sold drugs from the residence and that she took $11,000 in drug proceeds from a dresser located in the residence.  The affidavit also outlined Mauger's qualifications, training, and experience with narcotics investigations.  Based on the totality of the circumstances, the issuing municipal court judge had a substantial basis to conclude there was a fair probability that the residence at 5903 Little Brook Way contained drugs or drug paraphernalia.

{¶ 37} The second assignment of error is overruled.

### 3.  Third Assignment of Error

{¶ 38} In his third assignment of error, appellant challenges the denial of his motion to suppress evidence found during a search of his public storage unit located at 3275 Gender Road on February 3, 2012.  Appellant first claims that the search of the storage unit was based on a warrant supported by an affidavit that contained material misstatements and omissions and that the warrant facially lacked probable cause.

{¶ 39} As to the alleged misstatements and omissions, appellant maintains that the affidavit erroneously stated that the cocaine and marijuana recovered from appellant's vehicle following the traffic stop in the early morning hours of February 3, 2012 was found near where appellant was seated and omitted information that Wiggins, the driver of the vehicle, reportedly claimed ownership of the drugs.  Appellant further maintains that the four corners of the affidavit failed to establish probable cause because the affidavit failed to establish that (1) police observed appellant at the storage unit prior to February 3, 2012, (2) police had specific information that appellant stored narcotics at the storage unit, and (3) police observed narcotics in the storage unit at any time prior to the search.

{¶ 40} At the suppression hearing, appellee presented the following testimony and evidence.  WPD Detective Guy Grinstead testified that he prepared the affidavit for the search warrant executed at the public storage facility on February 3, 2012.  According to Grinstead, he became involved in the case when Adams and Slosser informed him that

during a traffic stop of appellant's vehicle earlier that day, they recovered a business card for a public storage facility from appellant's person and small amounts of marijuana and cocaine from the vehicle's passenger side floorboard and backseat area, respectively. Grinstead utilized this information, along with the officers' written report detailing the same, as the basis for the search warrant affidavit. At the hearing, Grinstead identified the search warrant and accompanying affidavit. In that affidavit, Grinstead attested to the following.

{¶ 41} On January 31, 2012, officers from the RPD and the CPD executed a search warrant at appellant's home and recovered more than $5,000 cash, a small amount of powder cocaine, and a set of digital scales containing cocaine residue.

{¶ 42} On February 3, 2012, Adams and Slosser conducted a traffic stop of appellant's vehicle for an equipment violation. Due to recent police history involving appellant and narcotics, a narcotics canine was called to the scene. After the canine positively alerted to the scent of drugs inside the vehicle, the vehicle was searched, and a small amount of cocaine was found "near the area where [appellant] was sitting." (Grinstead Search Warrant Affidavit, Attachment 1.) In addition, a business card from a public storage facility recovered from appellant's person included "the address of the storage facility, the unit number and an access code to gain entry into the facility." (Grinstead Search Warrant Affidavit, Attachment 1.) The officers made a copy of the card and left it with the detective bureau.

{¶ 43} At approximately 10:00 a.m. on February 3, 2012, Grinstead went to the storage facility where employees informed him that the storage unit identified on the business card, unit #1614, was registered in appellant's name and was twice accessed on February 1, 2012. At approximately 11:00 a.m. on February 3, 2012, a Franklin County Sheriff's Office ("FCSO") canine unit was called to the storage facility. After passing several storage units, the narcotics dog positively alerted to the scent of narcotics in unit #1614.

{¶ 44} At the suppression hearing, Grinstead testified in more detail about the location of the cocaine recovered from appellant's vehicle during the February 3, 2012 traffic stop. Specifically, Grinstead stated that Adams and Slosser described appellant's vehicle as having two separate seats in the front, separated by a console, and one bench

seat extending all the way across the back.  The cocaine was discovered in the middle of the bench seat.  Grinstead testified that although the search warrant affidavit did not precisely describe the location of the cocaine, he considered that location to be "near the area" of appellant, as set forth in the affidavit, because it was "in reach of [appellant]." (Dec. 9, 2013 Tr. 54, 55.)

{¶ 45} Grinstead further testified that the report prepared by Adams and Slossser regarding the traffic stop included a statement by Wiggins that "[i]t's not mine, but I'll take the charge."  (Dec. 9, 2013 Tr. 57.)  Grinstead averred he did not include Wiggins' statement in the affidavit because such detailed information about the traffic stop was not relevant to the search of the storage unit; rather, the facts regarding the traffic stop were provided merely as background to demonstrate how he obtained the information about the storage unit.  On cross-examination, Grinstead conceded that he did not participate in the traffic stop and, thus, did not see the location of the drugs or whether appellant could access the drugs from where he was seated.

{¶ 46} The trial court found immaterial Grinstead's omission of Wiggins' statement in the search warrant affidavit.  The court also found Grinstead's testimony regarding Adams' and Slosser's statements about discovery of the drugs in the middle of the back seat sufficient to justify his averment in the affidavit regarding the location of the drugs.  Based on these findings, the court orally overruled this portion of appellant's motion to suppress.

{¶ 47} Upon review of the affidavit and the testimony adduced by appellee pertaining to the affidavit, we agree with the trial court that the information provided by Grinstead was sufficient for the municipal court judge to issue the search warrant for the storage unit.  As noted above, the trial court at a suppression hearing assumes the role of factfinder and is, thus, in the best position to resolve factual questions and evaluate witness credibility.  *Body* at ¶ 9, citing *Burnside* at ¶8.  As to Grinstead's alleged misstatement that the cocaine was discovered during the traffic stop near where appellant was seated, Grinstead testified in detail about Adams' and Slosser's description of the vehicle and the location of the cocaine within the vehicle, and the trial court, as factfinder, apparently found Grinstead's testimony credible in this regard.  As to Grinstead's omission of Wiggins' statement, the trial court, as factfinder, found credible Grinstead's

explanation for that omission.  We further note that Grinstead averred that Wiggins told Adams and Slosser that "[i]t's not mine, but I'll take the charge."  (Dec. 9, 2013 Tr. 57.) Contrary to appellant's contention, Wiggins did not claim ownership of the cocaine recovered from the vehicle; rather, Wiggins denied ownership.

{¶ 48} Further, Grinstead's affidavit sufficiently demonstrated probable cause to issue a search warrant for appellant's storage unit.  The affidavit related facts regarding the recovery of drugs from appellant's home pursuant to the search conducted three days earlier, the recovery of drugs and a business card connecting appellant to storage unit #1614 pursuant to the traffic stop occurring earlier in the day, Grinstead's ensuing investigation into appellant's connection to storage unit #1614, and the narcotics canine's positive alert to drugs in storage unit #1614.  The affidavit also stated that it is commonly known in the law enforcement community that narcotics traffickers store narcotics and assets inside storage facilities to avoid police detection.  In addition, the affidavit also outlined Grinstead's qualifications, training, and experience with narcotics investigations.

{¶ 49} Based on the totality of the circumstances, the issuing municipal court judge had a substantial basis to conclude there was a fair probability that drugs and drug paraphernalia would be found in storage unit #1614.

{¶ 50} Appellant also argues that the canine sniff of appellant's storage unit constituted an illegal search unsupported by probable cause.  Specifically, appellant contends the trial court failed to properly consider the canine's record of false positive alerts set forth in the field performance records.

{¶ 51} At the hearing, appellee presented the following testimony and evidence. FCSO Corporal Thomas Lung testified that, on February 3, 2012, he and his narcotics dog, Myra, were summoned to the storage facility based on a suspicion that narcotics were located in the one of the storage units.  Lung described Myra as a "single purpose dog," meaning that her "sole specialty" was detection of narcotics, including cocaine, through scent. (Dec. 9, 2013 Tr. 158.)

{¶ 52} Lung testified that, in 2010, Myra participated in a four-week training course in narcotics detection through Azzi International, a training facility from which FCSO frequently obtains narcotics dogs.  As her handler, Lung also participated in this training.  According to Lung, this training course was a prerequisite for Myra's

certification as a narcotics dog by the Ohio Peace Officer Training Academy ("OPOTA"). He described in detail the OPOTA narcotics detection certification process, identified documentation related to that certification, and averred that Myra successfully completed the OPOTA program and received certification. Lung stated that Myra never provided a false positive alert during the course of the OPOTA certification process. He further testified that following the OPOTA certification process, he and other canine handlers engaged in biweekly training sessions with Myra, during which she never provided a false positive alert.

{¶ 53} Lung also testified regarding detailed records maintained regarding Myra's post-certification field performance, and he identified those records for purposes of the hearing. Those records demonstrated that Myra "falsely" alerted to the presence of narcotics in approximately 30 percent of her sniffs in circumstances where the occupants of a vehicle upon which she alerted admitted that narcotics had been present in the vehicle but had been disposed of in some way (smoked, ingested, etc.) immediately prior to search of the vehicle. The records further demonstrated that Myra "falsely" alerted to the presence of narcotics in approximately 10 percent of her sniffs in circumstances where the occupants of a vehicle upon which she alerted never admitted to the presence of narcotics inside the vehicle. Lung described Myra's ability to detect hidden narcotics as "very effective," both in general and as specifically related to the sniff conducted at the storage unit on February 3, 2012. (Dec. 9, 2013 Tr. 173.)

{¶ 54} The trial court noted that Myra had never provided a false positive alert during the OPOTA certification process or her post-certification training sessions. The court discounted the evidence regarding Myra's "false positives"[6] during field performance, noting the difficulty in objectively quantifying such data. On this basis, the court orally overruled this portion of appellant's motion to suppress.

{¶ 55} Appellant's contention that the trial court failed to consider Myra's record of false positive alerts during field performance is belied by the record. The parties and the trial court engaged in an extensive discussion of this issue, following which the trial court

---

[6] The trial court found the state's characterization of these circumstances as "false positives" to be technically incorrect, given the testimony establishing that narcotics existed in the vehicles immediately prior to search. (Dec. 9, 2013 Tr. 195.)

concluded that Myra's field performance records were not objectively verifiable. Appellant does not challenge the trial court's conclusion in this regard; rather, appellant argues only that the trial court refused to give any consideration to Myra's field performance reports. As the trial court clearly considered the field performance reports, appellant's contention is without merit.

{¶ 56} Moreover, we note that in *State v. Nguyen*, 157 Ohio App.3d 482, 2004-Ohio-2879 (6th Dist.), the court engaged in an extensive survey of federal and state law related to the matter of establishing canine reliability and the evidence required to do so. The court acknowledged the national trend on this issue, stating that "a drug dog's training and certification records can be used to uphold a finding of probable cause to search and can be used to show reliability, if required, but canine reliability does not always need to be shown by real world records." *Id.* at ¶ 46. The court held that "proof of the fact that a drug dog is properly trained and certified is the only evidence material to a determination that a particular dog is reliable." *Id.* at ¶ 55. The court stated that "[p]roof that a drug dog is properly trained and certified may be established by means of testimony or through documentary proof." *Id.*

{¶ 57} In the present case, appellee presented both testimony and documentary proof establishing that Myra was properly trained and certified as a narcotics-detection canine. Pursuant to *Nguyen*, this evidence was sufficient to establish her reliability. Thus, evidence regarding Myra's false positive alerts in her field performance records was immaterial to establishing her reliability.

{¶ 58} The third assignment of error is overruled.

### 4. Fourth Assignment of Error

{¶ 59} In his fourth assignment of error, appellant challenges the denial of his motion to suppress evidence obtained following a traffic stop at the storage facility at approximately 2:00 p.m. on February 3, 2012. Appellant claims that the stop and subsequent warrantless search of his vehicle was not supported by probable cause or even reasonable suspicion in violation of his Fourth Amendment rights.

{¶ 60} At the suppression hearing, appellee presented the testimony of WPD Detectives Chad Wilder and Downard. Wilder testified that Grinstead requested that he safeguard storage unit #1614 while Grinstead obtained a search warrant for the unit.

Wilder was provided a photograph of appellant and was informed that appellant had rented unit #1614 and had last been seen driving a gold four-door Chevy Impala. Wilder averred he was also aware that appellant had been arrested in November 2010 for possession of a handgun, RPD officers had recently conducted a search of appellant's residence which resulted in the discovery of several thousand dollars in cash and cocaine residue, appellant had an extensive criminal history, including felony drug arrests and weapons violations, and a traffic stop of appellant earlier in the day resulted in the recovery of narcotics from his vehicle.

{¶ 61} Wilder drove to the storage facility in an unmarked undercover vehicle. The storage facility housed multiple rows of storage units. Appellant's storage unit, #1614, was located at the back of the facility. Wilder parked his vehicle near unit #1614 and was later joined by Downard, who also drove an unmarked undercover vehicle. Both detectives were dressed in plain clothes.

{¶ 62} Wilder observed a gold Chevy Impala driving slowly around the back of the storage facility near unit #1614. When the Impala pulled beside him, Wilder recognized appellant as the driver. He also observed a second individual in the front passenger seat, later identified as Wiggins, and a third individual in the back seat, later identified as Deandre Green. Wilder displayed the police badge hanging from a lanyard around his neck, identified himself as a police officer, and ordered the occupants to put their hands in the air. Appellant did not immediately comply with the order, and, according to Wilder, "it appeared * * * that [appellant] was going to take off and not stay put." (Dec. 10, 2013 Tr. 257.) Wilder produced his service weapon, pointed it at the vehicle, and again ordered the occupants to put their hands in the air. Wilder then observed Green reach down as if to retrieve or conceal a weapon or contraband. Appellant immediately drove away at a high rate of speed.

{¶ 63} Wilder eventually located appellant attempting to exit the storage facility through the front gate. He approached the vehicle and observed Green with marijuana vegetation in his lap. Wilder drew his service weapon and ordered appellant and the other occupants to exit the vehicle. As Green exited the vehicle, Wilder observed a cigar filled with marijuana roll off the back seat onto the floorboard. He also smelled a "very strong" odor of marijuana coming from the vehicle. (Dec. 9, 2013 Tr. 97.)

{¶ 64} According to Wilder, appellant asked why he had been detained. Wilder explained that law enforcement officers would soon execute a search warrant at unit #1614. When Wilder asked appellant why he "took off," appellant stated that he "thought he was getting robbed." (Dec. 9, 2013 Tr. 99.)

{¶ 65} Wilder arrested appellant and searched the vehicle incident to the arrest. A digital scale with white residue and keys to unit #1614 were recovered during the search. Wilder also conducted a pat-down search of Wiggins and Green. As nothing linking them to storage unit #1614 was recovered, they were released.

{¶ 66} Wilder testified that he stopped appellant's vehicle because he was concerned that appellant was at the storage facility to pick up or drop off narcotics. In addition, appellant fled after Wilder identified himself as a police officer. He further stated that he had previously executed search warrants at other storage facilities which resulted in recovery of large amounts of cash and weapons; accordingly, he was concerned for his own safety as well as that of Downard.

{¶ 67} On cross-examination, Wilder conceded that prior to the time he stopped appellant, he had neither observed appellant violate a traffic law nor observed appellant or any of the vehicle's occupants engage in criminal activity. He explained that he made the initial decision to stop appellant's vehicle when he realized appellant was the driver. He based this decision on several factors: his previous experience that narcotics dealers often utilize storage facilities to harbor and conceal narcotics, cash, and weapons, his knowledge of the narcotics dog's alert on storage unit #1614, his knowledge of appellant's extensive criminal history involving weapons and narcotics, his concern that appellant would gain access to unit #1614 and retrieve contraband contained therein, and his knowledge of the traffic stop earlier in the day.

{¶ 68} Wilder further conceded that at the time he initially stopped appellant, he did not have an arrest warrant for him and did not know whether the search warrant for unit #1614 had been approved. He further acknowledged that he had not seen appellant attempt to access unit #1614 and had not seen any weapons inside the vehicle.

{¶ 69} Downard testified that Wilder requested his aid in safeguarding storage unit #1614 while Grinstead obtained a search warrant. Downard corroborated Wilder's testimony regarding appellant's actions in slowly driving near unit #1614, Wilder's initial

order that appellant stop his vehicle, and appellant's failure to heed that order. As did Wilder, Downard conceded on cross-examination that at the time Wilder initially ordered appellant to stop his vehicle, Downard had not observed appellant violate a traffic law or otherwise engage in criminal activity.

{¶ 70} Following presentation of its evidence, appellee argued that Wilder had reasonable suspicion that criminal activity, i.e., drug trafficking, was afoot at the time he stopped appellant's vehicle based on the information obtained from the RPD, appellant's extensive criminal history, the narcotics dog's alert on storage unit #1614 and the ensuing effort to obtain a search warrant for that unit, and the fact that appellant fled after Wilder initially ordered him to stop. Appellee further argued that once the vehicle was stopped, the strong odor of marijuana provided Wilder probable cause to conduct a warrantless search of the vehicle under the automobile exception.

{¶ 71} In response, appellant argued that the factors cited by appellee did not constitute reasonable suspicion justifying the stop. Appellant specifically argued that Wilder's pointing of his service weapon at appellant was unreasonable and was actually the impetus for his fleeing the area as it placed him in fear for his own safety. Appellant also noted that he was detained near the front gate of the storage facility, creating a reasonable inference that he was planning to leave the storage facility rather than access unit #1614.

{¶ 72} Following argument by the parties, the trial court found that the traffic stop was not constitutionally unreasonable and orally overruled this portion of the motion to suppress.

{¶ 73} As noted above, the stopping of an automobile and the temporary detention of its occupants constitutes a seizure for Fourth Amendment purposes. *Dorsey* at ¶ 17. Warrantless seizures of this type are per se unreasonable in the absence of a valid exception such as a *Terry* stop. *Id.* Under *Terry*, a police officer may stop or detain an individual without probable cause when the officer has reasonable suspicion, based on specific, articulable facts, taken together with rational inferences from those facts, that criminal activity is afoot. *Id.* at 21-22. Accordingly, "[a]n investigative stop does not violate the Fourth Amendment to the United States Constitution if the police have reasonable suspicion that 'the person stopped is, or is about to be, engaged in criminal

activity.' " *State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, ¶ 35, quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981).

{¶ 74} The reasonableness of an investigatory stop depends upon the totality of the circumstances surrounding the incident. *State v. Williams,* 51 Ohio St.3d 58, 60 (1990). A court evaluating the validity of a *Terry* stop must consider the totality of the circumstances as "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991), citing *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir.1976). "Reasonable suspicion entails some minimal level of objective justification for making a stop—that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones*, 70 Ohio App.3d 554, 556-57 (2d Dist.1990), citing *Terry* at 27.

{¶ 75} Given the totality of the circumstances surrounding the incident in the present case, as "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold," we conclude that Wilder had sufficient reasonable suspicion that appellant was actively engaged in drug-related activity to justify the stop. *Andrews* at 87-88. At the time of the stop, Wilder had been deployed to safeguard appellant's storage unit pending the issuance of a search warrant. Wilder was aware, through previous police experience, that narcotics traffickers conceal narcotics, cash, and weapons in storage facilities. Wilder was also aware that a trained canine unit had alerted to the scent of narcotics coming from the storage unit. Wilder was also aware that a search of appellant's residence three days before had resulted in the discovery of several thousand dollars in cash as well as cocaine residue, that appellant had an extensive criminal history, including felony drug arrests and weapons violations, and that a traffic stop of appellant earlier in the day resulted in the recovery of narcotics and a business card identifying the storage unit. While securing the scene, Wilder observed appellant driving slowly toward the storage unit, which was at the back of the facility. Wilder initiated the stop due to his concern that appellant would gain access the storage unit and retrieve contraband contained therein.

{¶ 76} Contrary to appellant's suggestion, under the circumstances herein, it was not necessary for Wilder to have observed appellant commit a traffic violation or other

crime prior to initiating the stop. Wilder's testimony establishes that he had substantially more than "an inchoate and unparticularized suspicion or 'hunch' " that criminal activity was afoot. *Id.* Indeed, Wilder's testimony establishes that he had more than a "minimal level of objective justification" for making the stop. *Id.*

{¶ 77} Appellant's contention that the warrantless search of his vehicle was not supported by probable cause is also without merit. Wilder testified that after stopping appellant's vehicle, he smelled a "very strong" odor of marijuana coming from the vehicle. (Dec. 9, 2013 Tr. 97.) The Supreme Court of Ohio has held that "the smell of marijuana, alone, by a person qualified to recognize the odor, is sufficient to establish probable cause to conduct a search." *State v. Moore*, 90 Ohio St.3d 47, 53 (2000). Although appellant now disputes Wilder's testimony, he points to no evidence in the record substantiating his claim. Pursuant to *Moore,* the testimony presented by Wilder, a narcotics detective qualified to recognize the odor of marijuana, was sufficient to establish probable cause to conduct the warrantless search of appellant's vehicle.

{¶ 78} The fourth assignment of error is overruled.

## B. Fifth Assignment of Error—Ineffective Assistance of Counsel

{¶ 79} In his fifth assignment of error, appellant contends his initial[7] trial counsel was ineffective in failing to file a motion to suppress challenging the legality of the February 3, 2012 early morning traffic stop and the qualifications and reliability of the canine unit involved in that stop.

{¶ 80} In Ohio, a properly licensed attorney is presumed competent. *Vaughn v. Maxwell*, 2 Ohio St.2d 299, 301 (1965). Therefore, the burden of demonstrating ineffective assistance of counsel is on the party asserting it. *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). Additionally, in fairly assessing counsel's performance, there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101.

{¶ 81} "[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [court] cannot be relied on as having produced a just result." *Strickland v.*

---

[7] Appellant obtained new trial counsel in September 2013. His second trial counsel also serves as his appellate counsel.

*Washington*, 466 U.S. 668, 686 (1984). In order to succeed on a claim of ineffective assistance of counsel, appellant must satisfy a two-prong test. First, he must demonstrate that his trial counsel's performance was deficient. *Id.* at 687. This requires a showing that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* If he can show deficient performance, he must next demonstrate that he was prejudiced by the deficient performance. *Id.* To show prejudice, he must establish there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the trial would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* at 694.

{¶ 82} The failure to file a motion to suppress is not ineffective assistance of counsel per se. *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, ¶ 65, citing *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000). In order to establish ineffective assistance of counsel for failure to file a motion to suppress, the defendant must prove there was a basis for suppressing the evidence at issue. *Id.*, citing *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 35. Counsel is not deficient for failing to raise a meritless issue. *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, ¶ 117, citing *State v. Taylor*, 78 Ohio St.3d 15, 31 (1997).

{¶ 83} " '[T]he ineffective assistance of counsel test set forth in *Strickland* can be summarized, in cases involving a failure to make a motion on behalf of the defendant * * * as requiring the defendant to: (1) show that the motion * * * was meritorious, and (2) show that there was a reasonable probability that the verdict would have been different had the motion been made.' " *State v. Simms*, 10th Dist. No. 10AP-1063, 2012-Ohio-2321, ¶ 50, quoting *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 63, citing *State v. Santana*, 90 Ohio St.3d 513 (2001), and *State v. Lott*, 51 Ohio St.3d 160 (1990). " 'Where the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion.' " *Id.*, quoting *State v. Gibson*, 69 Ohio App.2d 91, 95 (8th Dist.1980).

{¶ 84} As this court has recognized, the failure to file a motion to suppress may constitute ineffective assistance of counsel where there is a solid possibility that the court

would have suppressed the evidence. *State v. Jones*, 10th Dist. No. 99AP-704 (June 13, 2000), citing *State v. Garrett*, 76 Ohio App.3d 57 (11th Dist.1991). Nevertheless, even when some evidence in the record supports a motion to suppress, we must presume that defense counsel was effective if counsel could have reasonably decided that filing a motion to suppress would have been a futile act. *Id.*, citing *State v. Edwards*, 8th Dist. No. 69077 (July 11, 1996), citing *State v. Martin*, 20 Ohio App.3d 172 (1st Dist.1983).

{¶ 85} We find no merit to appellant's first contention that his initial trial counsel was ineffective for failing to challenge the legality of the traffic stop, as such challenge would have been futile. Adams testified that he initiated the traffic stop due to a malfunctioning rear license plate light. Every vehicle that is required to have a registration plate is also required to have a light illuminating that plate. *See* R.C. 4513.05. Appellant does not claim that his license plate light was functioning at the time of the stop, nor does the record contain any factual support for such a conclusion. Rather, appellant only asserts that "some doubt" as to a violation was created by the fact that Adams "had no trouble reading the tag on the car." (Appellant's Brief, 21.) However, Adams' ability to read the license plate did not excuse appellant from complying with Ohio law. Accordingly, a challenge to the validity of the stop based on the grounds now asserted by appellant would have been meritless. Trial counsel was not deficient for failing to raise this meritless challenge. *Yarbrough.*

{¶ 86} We also disagree with appellant's contention that trial counsel was ineffective for failing to challenge the qualifications or reliability of the canine unit. Appellant cites no authority requiring counsel to challenge the qualifications or reliability of a canine unit in every case. Moreover, an attorney's decision not to file a motion to suppress may be considered a trial strategy. *See State v. Clark*, 2d Dist. No. 2013 CA 52, 2014-Ohio-855, ¶ 33. Decisions on trial strategy and tactics are generally afforded a wide latitude of professional judgment, and it is not the duty of a reviewing court to analyze trial counsel's legal tactics and maneuvers. *State v. Gau*, 11th Dist. No. 2005-A-0082, 2006-Ohio-6531, ¶ 35, citing *Strickland* at 689.

{¶ 87} In the present case, appellant's initial trial counsel filed a motion to suppress challenging the duration of the traffic stop on constitutional grounds. The record does not reveal why counsel may have chosen not to pursue a challenge to the

qualifications or reliability of the canine unit employed during that traffic stop. Without some indication in the record that it was objectively unreasonable for counsel not to do so, we conclude counsel's decision was a strategic one. Trial tactics, even debatable ones, do not establish ineffective assistance of counsel. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 146.

{¶ 88} The fifth assignment of error is overruled.

### C. Sixth, Seventh, Eighth, Ninth, and Tenth Assignments of Error– Trial Issues

{¶ 89} Appellant's sixth, seventh, eighth, ninth, and tenth assignments of error all involve issues related to trial. Before addressing the individual assignments of error, we set forth the relevant evidence adduced from appellee's case-in-chief.[8]

### 1. Trial Evidence

{¶ 90} On January 25, 2012, Mauger received an anonymous call regarding suspected narcotics trafficking at a residence located at 5903 Little Brook Way. The caller reported the license numbers for two vehicles parked at the residence. Based on this call, Mauger conducted surveillance of the residence the next day, and he verified the accuracy of the license numbers provided by the caller. Pursuant to a subsequent vehicle registration check, Mauger identified appellant and McWhorter as the owners. On January 27, 2012, Mauger performed a trash pull of trash deposited at the end of appellant's driveway. The trash pull resulted in the recovery of several baggies wrapped with electrical tape. One of the baggies contained a white residue. Mauger field tested the substance and concluded that it was cocaine.

{¶ 91} Based on these facts, Mauger obtained a search warrant for 5903 Little Brook Way and the vehicles registered to appellant and McWhorter. With the aid of Downard and the CPD, Mauger executed the search warrant on January 31, 2012. Both appellant and McWhorter were present at the time of the search. The search resulted in

---

[8] Because these assignments of error present challenges to the trial proceedings, including the sufficiency and manifest weight of the evidence, and because the trial evidence is not identical to the evidence presented at the suppression hearings, we separately set forth the evidence presented to the jury.

the discovery of $5,020 in cash, a 9 mm weapon, a plastic baggie containing cocaine residue, and a digital scale containing cocaine residue.[9]

{¶ 92} Three days later, on February 3, 2012, Adams conducted a traffic stop of appellant's vehicle based on a license plate illumination violation. Appellant was seated in the front passenger seat; Wiggins was the driver. During the traffic stop, Adams summoned a canine unit to the scene. After appellant and Wiggins were removed from the vehicle, the canine alerted to the scent of narcotics inside the vehicle. A subsequent search of the vehicle revealed marijuana "shake" on the passenger's side floor and cocaine in a bag in the middle of the backseat.[10] (Dec. 11, 2013 Tr. 444.) Adams placed appellant under arrest and, pursuant to a pat-down search, discovered a business card for a public storage facility. The card included the name and address of the storage facility, an eight-digit access code to the facility, and the number of a particular storage unit within that facility. Adams subsequently made a copy of the storage facility card, returned the original to appellant, and thereafter released him.

{¶ 93} Later that day, Grinstead was informed of the traffic stop and subsequent discovery of the storage facility card on appellant's person. Grinstead contacted the storage facility and was informed by facility management that, on February 1, 2012, appellant rented a storage unit at a facility located on Gender Road. Grinstead and Wilder traveled to the Gender Road location and spoke to facility management, who verified that appellant leased unit #1614.[11] Grinstead and Wilder then drove to unit #1614 and summoned a canine unit to the scene. After the narcotics dog alerted to narcotics in unit #1614, Grinstead prepared a search warrant affidavit for unit #1614. He left Wilder to safeguard the storage unit while he obtained a search warrant from a judge.

---

[9] The parties stipulated, pursuant to a laboratory report generated by an Ohio Bureau of Criminal Identification and Investigation ("BCI&I") forensic scientist, that the residue in both the plastic baggie and on the digital scale was cocaine. (State's exhibit F.)

[10] The parties stipulated, pursuant to a laboratory report generated by a BCI&I forensic scientist, that the substance inside the bag was cocaine. (State's exhibit G.)

[11] The parties stipulated that records kept by the Gender Road storage facility in the ordinary course of business established that appellant entered into a rental agreement for unit #1614 on February 1, 2012. (State's exhibit D.)

{¶ 94} Thereafter, Wilder requested Downard's aid in safeguarding the storage unit.[12]  Downard thereafter met Wilder at the storage unit.  Both Downard and Wilder were dressed in plain clothes and drove unmarked police vehicles.  Wilder noticed a vehicle driving slowly in the vicinity of unit #1614.[13]  Wilder noted the license number and identified the vehicle as the one involved in the traffic stop earlier that day.  In addition to appellant, the vehicle contained two other male occupants—Wiggins in the front passenger seat and Green in the back seat.  Wilder eventually positioned his vehicle "[d]river's side window to driver's side window" with appellant's vehicle, displayed his police badge, and yelled "[p]olice.  Get your hands up where I can see them."  (Dec. 11, 2013 Tr. 483.)  At trial, Downard corroborated this testimony.

{¶ 95} According to Wilder, Green "frantically immediately reached down to the left of his seat * * * as if he was maybe trying to place something there or pick something up that he had dropped."  (Dec. 11, 2013 Tr. 485.)  Because appellant did not immediately heed Wilder's command, Wilder believed app[ellant was going to drive away.  Wilder again displayed his police badge, identified himself as a police officer, produced his service weapon, and again ordered appellant and the other occupants to "[g]et your hands up where I can see them."  (Dec. 11, 2013 Tr. 484.)  Appellant immediately drove off at a high rate of speed.  Wilder pursued the vehicle and eventually located it at the front gate.  Wilder ordered appellant to stop the vehicle.  Appellant complied and Wilder approached the vehicle.  As he did so, Wilder noticed a "very strong odor of burning marijuana coming from the vehicle."  (Dec. 11, 2013 Tr. 488.)  Wilder ordered appellant and the passengers to exit the vehicle.  As Green exited, Wilder observed marijuana vegetation fall from his lap and a cigar filled with marijuana fall to the floor.  Pursuant to a search of the vehicle, Wilder recovered a digital scale containing white residue in the console area between the front seats.  The white residue was field tested and determined to be cocaine.

---

[12] Wilder testified that he enlisted Downard for safety reasons, as drug traffickers frequently store narcotics, large amounts of cash, and firearms in public storage units.

[13] Because he was aware of the ongoing investigation surrounding appellant, and due to concerns that appellant might drop off or retrieve narcotics from the storage unit, Wilder familiarized himself with appellant's photograph and license number of his vehicle.

{¶ 96} Wilder removed the keys from the ignition and found two keys to the storage unit on the key chain.[14] About the same time, Grinstead returned with a search warrant for the storage unit. Wilder thereafter used the keys found on appellant's key chain to open two locks on the storage unit. Inside the storage unit was a black duffel bag containing two operable firearms, a bag of loose ammunition, $54,800 in cash, and 138 grams of powder cocaine.[15]

{¶ 97} Appellant, Green, and Wiggins were all searched. Police recovered a storage facility card from appellant which included the number of the storage unit, #1614, as well as an access code to the facility. Appellant was arrested; Wiggins and Green were released.

### 2. Sixth Assignment of Error–Prosecutorial Misconduct

{¶ 98} In his sixth assignment of error, appellant contends the prosecutor engaged in misconduct by commenting in closing argument on appellant's failure to testify at trial. Appellant argues this prosecutorial misconduct deprived him of due process of law and denied him a fair trial.

{¶ 99} Prosecutors are normally given wide latitude in their closing arguments. *State v. Maurer*, 15 Ohio St.3d 239 (1984). However, a prosecutor may not comment on a defendant's failure to testify at trial, as such comments may violate the defendant's Fifth Amendment rights. *State v. Fears*, 86 Ohio St.3d 329 (1999). The test for determining whether such a violation has occurred is " 'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *Id.* at 336, quoting *State v. Webb*, 70 Ohio St.3d 325, 328 (1994).

{¶ 100} In the present case, defense counsel averred during opening statement:

> [W]hat we need to do is to do our best to go back in time to
> that day and let's go to the storage unit and let's see how it
> unfolds. Let's see what happens if we're inside [appellant's]
> car.

---

[14] Each storage unit contains two separate locks accessed by two separate keys.

[15] The parties stipulated, pursuant to laboratory reports generated by BCI&I forensic scientists, that both firearms were operable and that the narcotics recovered constituted 138 grams of cocaine. (State's exhibit H.)

> Dude, why do you need me to give a ride out here?  You had my car last night.  You could have gone out here.  You got your key. * * *
>
> What's this going on up here?  Dude, what are these guys up by my storage unit?  What's this guy telling us to stop?  Dude, what did you put in my storage unit?  What do you mean take off?
>
> All right.  I'll step on it.  We got to get out of here, but we're talking.
>
> Put your hands up.
>
> What?  You put your dope, guns, in my unit?  Dude, you better tell them it's yours.

(Dec. 11, 2013 Tr. 314-15.)

{¶ 101} Following presentation of appellee's case-in-chief, the parties and the trial court engaged in a lengthy discussion regarding jury instructions.  The trial court raised an issue about defense counsel's above-quoted averments.  The court stated that it did not raise any concerns about defense counsel's statements at the time they were made because it would "have no way of knowing whether any such evidence would be adduced." (Dec. 12, 2013 Tr. 613.)  The court then expressed concern about how a curative jury instruction should be crafted so as to avoid "impu[gning] in any way the defendant's right not to testify."  (Dec. 12, 2013 Tr. 618.)

{¶ 102} In response, defense counsel averred:

> I would just suggest this: A, it's not evidence.  B, I'm very concerned about encroaching upon his right to testify or not testify, and *I think the appropriate method is to let the government argue that.*  They'll have two bites at the apple there.  They can have comments on that.  I'm sure that they'll address that.  *If they want to rake me personally over the coals for promising and not delivering, so be it.*

(Emphasis added.)  (Dec. 12, 2013 Tr. 619.)

{¶ 103} Subsequently, appellant rested his case without calling any witnesses.

{¶ 104} Therafter, during closing argument, the prosecutor averred:

> [The judge will] also tell you that opening statements are not evidence. It wasn't a day and a half ago you saw [defense counsel] sit here in a chair and *do a one-man play about what this defendant's story was.*
>
> Do you know how I know that that was not evidence? I did not get to cross-examine one person.
>
> You all promised this judge that you will listen to his instructions of law, and you swore that was your duty. Evidence comes from the stand and stipulations. That play was not evidence.

(Emphasis added.) (Dec. 12, 2013 Tr. 629.)

{¶ 105} Appellant contends that the italicized portion of the prosecutor's statement effectively highlighted to the jury his failure to testify. We note initially that defense counsel failed to object to the prosecutor's statement. Thus, he has forfeited all but plain error. *See* Crim.R. 52(B). Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "To constitute plain error, the error must be obvious on the record, palpable, and fundamental such that it should have been apparent to the trial court without objection." *State v. Gullick*, 10th Dist. No. 13AP-26, 2013-Ohio-3342, ¶ 3, citing *State v. Tichon*, 102 Ohio App.3d 758, 767 (9th Dist.1995). In addition, plain error is not present unless the appellant establishes that but for the error complained of, the outcome of the trial clearly would have been different. *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996). A reviewing court notices plain error "with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Gullick* at ¶ 3, citing *State v. Phillips*, 74 Ohio St.3d 72, 83 (1995).

{¶ 106} Despite the suggestions made by defense counsel in the opening statement regarding what may have transpired inside appellant's vehicle at the storage facility, appellant presented no evidence in this regard. "Counsel [including the prosecutor] is entitled to latitude in closing arguments as to what the evidence has shown." *State v. Twyford*, 94 Ohio St.3d 340, 356 (2002), citing *State v. Smith*, 80 Ohio St.3d 89, 111 (1997). The prosecutor's comments can be read as a reminder to the jury that it must consider only the evidence actually presented during the trial and that defense counsel's

opening statement was not evidence because it was not testimony from the witness stand, subject to cross-examination.  The prosecutor did not specifically refer to appellant's choice not to testify or even to a matter to which only appellant could testify.  For instance, Wiggins or Green could have testified about any conversation that took place inside appellant's vehicle while at the storage facility.

{¶ 107} Even if the prosecutor's comments arguably constituted an impermissible reference to appellant's failure to testify, such comments neither materially prejudiced appellant nor denied him a fair trial.  *Id.*  Appellant presented no evidence at trial, and the evidence of his guilt was compelling.  In addition, the trial court instructed the jury that it was not to consider appellant's decision not to testify "for any purpose."  (Dec. 12, 2013 Tr. 656.)  A jury is presumed to follow a trial court's instructions.  *State v. McKinney*, 10th Dist. No. 13AP-211, 2013-Ohio-5394, ¶ 15.

{¶ 108} The sixth assignment of error is overruled.

### 3.  Seventh Assignment of Error—Sufficiency of the Evidence

{¶ 109} In his seventh assignment of error, appellant contends the evidence presented by appellee was insufficient as a matter of law to sustain his cocaine possession and WUD convictions.  We disagree.

{¶ 110} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Whether the evidence is legally sufficient to support a verdict is a question of law, not fact.  *Id.*  In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact.  *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 111} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence

supports the conviction. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime").

{¶ 112} Defendant was convicted of possession of cocaine in an amount equal to or exceeding 100 grams in violation of R.C. 2925.11, which provides in pertinent part:

> (A) No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog.
>
> * * *
>
> (C) Whoever violates division (A) of this section is guilty of one of the following:
>
> * * *
>
> (4) If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of possession of cocaine. The penalty for the offense shall be determined as follows:
>
> * * *
>
> (f) If the amount of the drug involved equals or exceeds one hundred grams of cocaine, possession of cocaine is a felony of the first degree * * *.

{¶ 113} "Knowingly" is defined in R.C. 2901.22(B):

> A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

{¶ 114} "Possession" is defined in R.C. 2925.01(K):

> "Possess" or "possession" means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found.

{¶ 115} Appellant does not dispute that the substance found in his storage unit was cocaine in an amount exceeding 100 grams. Rather, appellant argues that appellee presented insufficient evidence on the elements of knowledge and possession. Appellant contends the only proof offered by appellee on these elements was appellant's possession of a business card which included an access code to the storage facility, keys to the storage unit where the cocaine was found, and his presence at the storage unit on the day of the search. Appellant maintains that while the evidence undisputedly established that appellant rented the storage unit, appellee presented no evidence that he actually accessed it and deposited the cocaine inside.

{¶ 116} " 'Possession of a controlled substance may be actual or constructive.' " *State v. Saunders*, 10th Dist. No. 13AP-668, 2014-Ohio-1746, ¶ 18, quoting *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 27 (10th Dist.). " 'A person has actual possession of an item when it is within his immediate physical control.' " *Id.*, quoting *Pilgrim* at ¶ 27. " 'Constructive possession exists when a person knowingly exercises dominion and control of an object, even though the object may not be within the person's immediate physical possession.' " *Id.*, quoting *Pilgrim* at ¶ 27. " '[T]he surrounding facts and circumstances, including the defendant's actions, constitute evidence from which the trier of fact can infer whether the defendant had constructive possession over the subject drugs.' " *Id.*, quoting *Pilgrim* at ¶ 28, citing *State v. Stanley*, 10th Dist. No. 06AP-323, 2007-Ohio-2786, ¶ 31. Inherent in a finding of constructive possession is the determination that a defendant had knowledge of the items purportedly possessed. *State v. Alexander*, 8th Dist. No. 90509, 2009-Ohio-597, ¶ 24.

{¶ 117} As noted above, the evidence presented by appellee established that a valid search of appellant's home on January 31, 2012 resulted in the discovery of a large amount of cash, along with digital scales that contained cocaine residue. One day later, on February 1, 2012, appellant rented a storage unit and, pursuant to that rental, was

provided an access code to the storage facility and keys to the locks on the unit. On February 3, 2012, appellant was involved in a traffic stop during which police arrested him for drug possession and discovered a business card identifying the access code to the facility and the number of a particular storage unit within the storage facility. A trained narcotics detection dog alerted to the scent of narcotics in the storage unit, and police safeguarded the unit pending issuance of a search warrant.

{¶ 118} While police awaited the search warrant, appellant drove into the storage facility and proceeded to the unit he had rented two days earlier. When he encountered a police officer who identified himself as such, appellant attempted to flee the storage facility but was apprehended at the front gate. The police eventually executed the search warrant on appellant's storage unit and found cocaine, firearms, and cash inside. Pursuant to subsequent laboratory analyses, it was determined that the cocaine weighed 138 grams, and the firearms were operable.

{¶ 119} Based on the surrounding facts and circumstances, including appellant's actions, a reasonable jury could conclude that appellant, following execution of the search warrant at his home, rented the storage unit for the purpose of concealing cocaine. A reasonable jury could further conclude that following the traffic stop during which police discovered a business card identifying an access code to the storage facility, appellant went to the storage unit to retrieve the cocaine he had placed there in order to avoid detection by the police. The fact that cocaine was discovered in the storage unit he rented demonstrates that he exercised dominion and control over it, even though it was not within his immediate physical possession at the time of his arrest. Viewing the evidence in a light most favorable to appellee, we conclude that appellant's conviction for cocaine possession was supported by legally sufficient evidence.

{¶ 120} Appellant was also found guilty of violating R.C. 2923.13(A)(2), WUD, which provides in part:

> Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
>
> * * *

> The person is under indictment for or has been convicted of any felony offense of violence.

{¶ 121} In order to "have" a firearm under R.C. 2923.13, one must either actually or constructively possess the firearm. *Dorsey* at ¶ 32. " 'Actual possession requires ownership and, or, physical control.' " *State v. Williams*, 10th Dist. No. 97APA02-255 (Sept. 30, 1997), quoting *State v. Hardy*, 60 Ohio App.2d 325, 327 (8th Dist.1978). "[A]ctual possession may be inferred when the defendant has exercised dominion and control over the area in which the firearm is found." *Id.* "Constructive possession of a firearm exists when a defendant knowingly has the power and intention at any given time to exercise dominion and control over a firearm, either directly or through others." *Dorsey* at ¶ 32.

{¶ 122} Given that the cocaine and firearms were discovered in appellant's storage unit at the same time, the same evidence that supports the conclusion that he knowingly possessed the cocaine also supports the conclusion that he knowingly "had" the firearms. At trial, appellant stipulated that he had a previous conviction for a felony drug abuse offense. Appellant also stipulated to the operability of the firearms. Viewing the evidence in a light most favorable to appellee, we conclude that appellant's WUD conviction was supported by legally sufficient evidence.

{¶ 123} The seventh assignment of error is overruled.

### 4. Eighth Assignment of Error—Manifest Weight of the Evidence

{¶ 124} In his eighth assignment of error, appellant contends his cocaine possession and WUD convictions are against the manifest weight of the evidence. We disagree.

{¶ 125} In determining whether a verdict is against the manifest weight of the evidence, an appellate court acts as a "thirteenth juror." Under this standard of review, an appellate court weighs the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. However, in engaging in this weighing, an appellate court must bear in mind the factfinder's superior, first-hand perspective in judging the demeanor and credibility of witnesses. *See State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The power to reverse on manifest-

weight grounds should only be used in exceptional circumstances when "the evidence weighs heavily against the conviction." *Thompkins* at 387.

{¶ 126} A defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was offered at trial. *State v. Campbell*, 10th Dist. No. 07AP-1001, 2008-Ohio-4831. " '[W]hile the [factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' " *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 113 (10th Dist.), quoting *State v. Craig*, 10th Dist. No. 99AP-739 (Mar. 23, 2000).

{¶ 127} Appellant presents a three-fold manifest-weight argument. Appellant first maintains that the evidence at trial suggested that at least one other person, namely Wiggins, had access to the storage unit and thus could have deposited the cocaine, firearms, and cash inside. Appellant notes that Wiggins was permitted to drive appellant's car from the scene following appellant's arrest in the early morning hours of February 3, 2012, and the key ring containing the car keys also contained keys to the storage unit where the cocaine, firearms, and cash were found. Appellant posits that Wiggins could have accessed the storage facility and deposited the contraband inside while appellant was in custody.

{¶ 128} Appellant's argument regarding Wiggins' potential access of the storage unit is speculative. The evidence established that in order to place items into the storage unit, an individual must have had access to both the storage facility and the individual storage unit. Following appellant's arrest in the early morning hours of February 3, 2012, police photocopied the business card that included the access code to the storage facility and returned it to appellant. As the card with the access code was in appellant's possession, Wiggins could not have accessed the storage facility while appellant was in custody. Appellant does not argue, and no evidence suggests, that Wiggins was aware of the access code prior to appellant's arrest. Further, the evidence presented did not establish that the keys to the storage unit were on appellant's key ring when Wiggins drove appellant's car following the traffic stop. Rather, the evidence only demonstrated that the keys were present on the key ring when appellant was detained at the storage facility later than day.

{¶ 129} Appellant secondly contends that Grinstead's cross-examination testimony establishing that he did not ask storage facility personnel to whom facility access codes were provided or how many storage unit keys existed created a reasonable inference that someone other than appellant may have had access to the storage unit and placed the contraband inside. Appellant's argument is speculative, however, and the jury apparently disregarded it on that basis. The mere possibility that others may have had access to the storage unit does not, by itself, preclude the jury from finding appellant guilty beyond a reasonable doubt, particularly given the evidence that appellant rented the storage unit one day after execution of a search warrant at his home which resulted in the discovery of cocaine residue and drug paraphernalia.

{¶ 130} Finally, appellant points to the undisputed testimony elicited from Grinstead on cross-examination that he did not request any scientific testing, such as fingerprinting, on the storage unit locks or the firearms and cocaine discovered inside the storage unit. Appellant contends that the lack of physical evidence connecting him to the storage unit and contraband contained therein renders his convictions against the manifest weight of the evidence. We note initially that Grinstead testified he did not request fingerprint analysis of the evidence recovered from the storage unit because the unit was registered to appellant. Moreover, appellant cites no authority, and we find none, establishing that the lack of such evidence mandates the reversal of a conviction as against the manifest weight of the evidence.

{¶ 131} In the present case, the jury did not lose its way simply because it chose to believe appellee's witnesses and version of the events. Appellant thoroughly cross-examined appellee's witnesses and elicited potentially discrediting testimony regarding appellee's case. However, the credibility of appellee's witnesses and the weight to be given to their testimony, including that elicited on cross-examination, were matters for the jury to resolve. *DeHass* at paragraph one of the syllabus. Reviewing the record as a whole, we cannot say that the evidence weighed heavily against appellant's convictions or that a manifest miscarriage of justice occurred.

{¶ 132} The eighth assignment of error is overruled.

### 5. Ninth Assignment of Error—Cumulative Effect of Trial Errors

{¶ 133} In his ninth assignment of error, appellant contends the trial court "committed critical errors in procedure and evidentiary rulings in which the cumulative effect denied him due process of law and a fair trial." (Appellant's Brief, 25.)

{¶ 134} Appellant first argues the trial court erroneously permitted hearsay testimony to be admitted. Decisions regarding the admissibility of evidence are within the discretion of the trial court. *Alternatives Unlimited-Special, Inc. v. Ohio Dept. of Edn.*, 10th Dist. No. 12AP-647, 2013-Ohio-3890, ¶ 48, citing *Banford v. Aldrich Chem. Co., Inc.*, 126 Ohio St.3d 210, 2010-Ohio-2470, ¶ 38. An appellate court will uphold such a decision absent an abuse of discretion. *Id.* Moreover, even in the event of an abuse of discretion, an appellate court cannot reverse the judgment unless the abuse materially prejudiced the complaining party. *Id.*

{¶ 135} Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, hearsay is inadmissible unless it falls within an exception. Evid.R. 802.

{¶ 136} In the first of two allegations regarding impermissible hearsay admission, appellant contends the trial court erred in permitting Adams to repeat Wiggins' hearsay statement as to who owned the cocaine found in appellant's vehicle.

{¶ 137} On cross-examination, defense counsel elicited testimony from Adams that although the cocaine found in the vehicle was accessible to both appellant and Wiggins, he arrested only appellant. On redirect examination, the prosecutor asked Adams why he chose to arrest appellant and not Wiggins. Adams responded, "[i]t was Mr. Phillips' car. Both men said it wasn't theirs'. The cocaine, that is, wasn't theirs'." (Dec. 11, 2013 Tr. 458-59.) Defense counsel objected, in his words, "*as a prophylactic method.*" (Emphasis added.) (Dec. 11, 2013 Tr. 459.) Defense counsel's phraseology suggests that the objection was lodged as a means of preventing further, similar testimony from Adams, rather than in response to what he had just said.

{¶ 138} After excusing the jury, the trial court questioned Adams about why he arrested appellant and not Wiggins. Adams averred he did so because both he and Wiggins denied ownership of the cocaine and because of appellant's previous criminal

history involving drugs found in his vehicle. The latter statement was based on "notes" from other law enforcement agencies Adams had accessed during his LEADS check. Thereafter, the parties and the trial court engaged in a discussion about these "notes," following which the trial court told Adams he could respond to the prosecutor's question in the following manner, "[g]iven the hearsay information that I received, I chose to arrest the defendant." (Dec. 11, 2013 Tr. 464.)

{¶ 139} After the jury returned, the trial court overruled the objection and permitted the prosecutor to re-ask Adams why he had arrested appellant and not Wiggins. In accordance with the trial court's instruction, Adams responded, "[b]ased on the hearsay with which I was provided." (Dec. 11, 2013 Tr. 465.) Given the "prophylactic" nature of defense counsel's objection and the fact that Adams did not provide further testimony about Wiggins' statement, we find no error in the admission of the testimony.

{¶ 140} Appellant secondly contends the trial court erred in permitting Grinstead to testify about statements made to him by storage facility personnel, which, according to appellant, were offered to establish that no one accessed appellant's storage unit while appellant was in jail following the early morning traffic stop.

{¶ 141} On cross-examination, defense counsel, in an effort to challenge the reliability and thoroughness of law enforcement's investigation and, more particularly, their focus on appellant rather than Wiggins or Green, elicited testimony from Grinstead establishing that he failed to ask storage facility personnel if they maintained security video for the premises, if access codes or keys were made available to multiple persons, whether they had ever seen Wiggins or Green, or how long the front gate of the facility remains open after an individual inputs the access code.

{¶ 142} On redirect examination, the prosecutor asked Grinstead what storage facility personnel told him about the access code. Defense counsel objected on hearsay grounds, and following a bench discussion, the trial court overruled the objection and permitted the prosecutor to rephrase the question. The prosecutor then asked, "Detective, for the purposes of your investigation, what was the response by the facility management as to when that code was accessed or used?" (Dec. 12, 2013 Tr. 589.) Grinstead responded that the code was accessed twice on February 1 and not at all on February 2 and 3. The prosecutor then asked Grinstead if the information provided was a

factor in his decision not to further investigate. Grinstead responded in the affirmative. Defense counsel did not object to these questions or the responses thereto.

{¶ 143} The trial court then instructed the jury that Grinstead's testimony about what security facility personnel told him, while technically hearsay, was permitted under an exception allowing an out-of-court statement made not for its truth, but to explain a police officer's investigative process. Thereafter, the prosecutor asked Grinstead "if the facility said that that code was accessed at 2:30 a.m. that morning when [appellant] was in the Whitehall Police Department, would that have been important to you?" (Dec. 12, 2013 Tr. 591.) Grinstead answered "yes," and thereafter averred that such information had not been provided to him. (Dec. 12, 2013 Tr. 591.) Defense counsel did not object to the question or the response.

{¶ 144} Appellant argues that Grinstead's testimony was not offered to explain his investigative actions, but, rather, for the truth of the matter, i.e., that no one accessed appellant's storage unit while he was in jail. Appellee argues that Grinstead's statement was offered solely to explain his conduct while investigating the crime, that is, to demonstrate that no additional investigation was necessary. Generally, out-of-court statements offered to explain a police officer's conduct while investigating a crime, rather than for their truth, are not hearsay. *State v. Thomas*, 61 Ohio St.2d 223, 232 (1980). However, where out-of-court statements are admitted merely to explain a police officer's conduct during the course of an investigation, "the potential for abuse in admitting such statements is great." *State v. Blevins*, 36 Ohio App.3d 147, 149 (10th Dist.1987). Indeed, the issue presented by these circumstances regards the purpose for the testimony, whether it was offered for the truth of the matter asserted or to explain Grinstead's conduct.

{¶ 145} Given the potential for abuse, this court has imposed certain conditions before such statements may be admitted. *State v. Faris*, 10th Dist. No. 93APA08-1211 (Mar. 24, 1994); *State v. Humphrey*, 10th Dist. No. 07AP-837, 2008-Ohio-6302, ¶ 11. Specifically, (1) the conduct to be explained must be relevant, equivocal, and contemporaneous with the out-of-court statement, and (2) the out-of-court statement must meet the standard of Evid.R. 403(A); that is, the evidence must be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion

of the issues or misleading the jury, even if it is relevant. *Id.*, citing *Blevins.* "[W]hen the statements connect the accused with the crime charged, they should generally be excluded." *Id.*

{¶ 146} As these conditions relate to the present appeal, the conduct to be explained involves Grinstead's investigation. Appellee argues Grinstead's conduct was relevant, equivocal, and contemporaneous with the statement made to him by the security facility personnel. We agree. Based on the information obtained from the storage facility personnel indicating that appellant's access code had not been used while he was in jail after his arrest, Grinstead focused his investigation on the person who rented the storage unit, i.e., appellant. Indeed, Grinstead testified that if he had been informed that the storage unit had been accessed while appellant was in jail, such information would have been important to him in his investigation. We perceive this testimony to mean that Grinstead would have concentrated his investigative efforts on someone other than appellant. We thus find no error in the admission of the testimony.

{¶ 147} Appellant lastly contends the trial court exhibited a "disturbing pattern of interrupting and embarrassing defense counsel before the jury." (Appellant's Brief, 26.) Appellant suggests that the trial court's conduct demonstrated a bias against him which ultimately resulted in jury prejudice against him.

{¶ 148} While a trial court has authority to control the proceedings during a criminal trial, including limiting the introduction of evidence and argument of counsel to relevant and material matters, the trial court also has an affirmative duty to prevent bias or prejudice against the defendant or the denial of a fair trial. *State v. Johnson*, 134 Ohio App.3d 586, 590 (1st Dist.1999). In effecting this duty, the trial court must be aware of its comments upon the jurors, as they are "highly sensitive" to the trial court's "every utterance." *Id.*, citing *State v. Wade*, 53 Ohio St.2d 182, 187-88 (1978).

{¶ 149} In *Wade*, the Supreme Court of Ohio set forth the standard to be applied in determining whether a trial court's comments reflect bias or impartiality:

> (1) The burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which

they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel.

*Id.* at 188.

{¶ 150} The *Wade* court further stated that the accused must object to the comments in order to provide the trial court an opportunity to correct the error by a curative instruction or otherwise. *Id.* The failure to object waives all but plain error. *Id.*

{¶ 151} Appellant argues the trial court was "unnecessarily curt" with defense counsel on "several occasions." (Appellant's Brief, 26.) In his first example, the parties and the trial court, out of the presence of the jury, were engaged in the aforementioned bench discussion regarding the "notes" Adams had accessed during his LEADS check. As the court was making a point about this issue, defense counsel interjected, "[t]hat's right," and the court responded, "[t]hank you. I don't need your comments." (Dec. 11, 2013 Tr. 463.) Because the jury was not present for the discussion, the court's comment could not have prejudiced appellant.

{¶ 152} Appellant's second example occurred during defense counsel's recross-examination of Wilder regarding the adequacy of the investigation into Wiggins and Green. The following exchange occurred:

> Q. And it was adequate not to make any effort to go out to their homes to see if they had any evidence in this case? That was adequate?
>
> A. I'm not aware if that was done or not.
>
> Q. Well, pull up. That's not what I'm asking you. I'm asking you was that adequate to you?
>
> A. I'm not aware if that was done or not.
>
> Q. Let's assume it's not done.
>
> A. Okay.
>
> Q. Is that adequate?
>
> A. It would depend on the entire circumstances of the case.

Q.  I get where this is going.  Thanks.

THE COURT:  Strike the comment.  The jury will disregard the comment.

I really don't like attorneys on either side speechifying.  Knock it off.

(Dec. 11, 2013 Tr. 540-41.)

{¶ 153} Initially, we interpret the trial court's averment that it would not tolerate "speechifying" by attorneys on either side a clear indication that the court was not biased against appellant.  In addition, defense counsel did not object to the comment; thus, the trial court was not provided the opportunity to take curative measures.  Thus, we cannot conclude that the comment rose to the level of plain error such that the outcome of the trial would have been different had the trial court not made it.  Crim.R. 52(B); *Jenks* at 282.

{¶ 154} Appellant also contends the trial court "lectured and embarrassed defense counsel about leaving an easel and pad out."  (Appellant's Brief, 27.)  Although the record is not entirely clear on this point, it appears that during cross-examination of Grinstead, defense counsel made some written notations on a paper attached to an easel which outlined to the jury the reasons Grinstead's investigation was inadequate.  At the close of cross-examination, the following exchange occurred:

THE COURT:  Okay. Excuse me.

Counsel?

MR. ROBEY:  I'm sorry.

THE COURT:  We don't leave them sitting up.

MR. ROBEY:  Okay.

THE COURT:  And you know that.  Please put it away.

Redirect please.

MR. ROBEY:  I wasn't sure if he wanted to use it.

THE COURT:  If he does, he'll ask.

MR. ROBEY:  Got it.

(Dec. 12, 2013 Tr. 585.)

{¶ 155} Contrary to appellant's contention, the trial court's comments did not constitute a "lecture."   Further, because defense counsel did not object to the court's statements, the trial court had no opportunity to take corrective action.  Accordingly, we cannot find that the comments rose to the level of plain error such that the outcome of the trial would have been different had the trial court not made them.

{¶ 156} The ninth assignment of error is overruled.

### 6.  Tenth Assignment of Error—Jury Instructions

{¶ 157} In his tenth assignment of error, appellant contends the trial court erred by instructing the jury on flight and aiding and abetting and by failing to give his "theory of defense instruction."  (Appellant's Brief, 27.)

{¶ 158} Our analysis begins with a review of Crim.R. 30(A), which provides in pertinent part that "[a]t the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. * * * The court shall inform counsel of its proposed action on the requests prior to counsel's arguments to the jury."  The rule further provides that "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."

{¶ 159} The record reveals that, prior to appellee resting its case and outside the presence of the jury, the trial court discussed its proposed jury instruction on aiding and abetting.  The trial court averred that such an instruction was proper even if the defendant was charged in the indictment as a principal rather than a complicitor, as long as the facts of the case reasonably supported such an instruction.  Concluding that the evidence in the present case reasonably supported such an instruction, the trial court resolved to include it.  Defense counsel did not object at this point in the proceedings.

{¶ 160} During this same discussion, the trial court averred that it found appellant's proposed "theory of defense" instruction to be improper, as it was "more of an argument"

that would be "absolutely fair game on closing argument." (Dec. 12, 2013 Tr. 611.) Again, defense counsel lodged no objection at this point in the proceedings.

{¶ 161} Following closing arguments, the trial court provided the following jury instruction on flight: "There has been an assertion of flight of the defendant as part of the evidence in this trial. Flight, if you find that it occurred, does not in and of itself raise a presumption of guilt but unless there is a satisfactory explanation for it, you may consider it in determining whether consciousness of guilt or a guilty connection with the crime existed." (Dec. 12, 2013 Tr. 657.)

{¶ 162} Later in the charge, the trial court provided the following instruction on aiding and abetting: "Regarding Count 1, you may also consider whether the state has proven, again beyond a reasonable doubt, that the defendant acted as an aider and abettor." (Dec. 12, 2013 Tr. 663.) The court continued, "[a]n aider or abettor is someone who shares the same degree of criminal intent or culpability as the principal offender where the aider or abettor supports, assists, encourages, cooperates with, or incites the criminal to commit an offense. Evidence of aiding and abetting may be shown by either direct or circumstantial evidence, and participation in criminal intent may be inferred from presence, companionship, and conduct before, during, or after the offense is committed." (Dec. 12, 2013 Tr. 663-64.) The court continued, "[n]ow, the mere presence of an accused at the scene of the crime is not sufficient to prove in and of itself that the accused was an aider and abettor. And as a matter of law, a principal offender and an aider and abettor are equally culpable if you find that the offense was committed." (Dec. 12, 2013 Tr. 664.)

{¶ 163} After the jury was charged, the trial court asked whether the parties had any objections to the instructions as provided. Defense counsel stated, "[w]e would object to the flight instruction. We would object to the aiding and abetting instruction. * * * We would ask for our theory of defense instruction on insufficient investigation." (Dec. 12, 2013 Tr. 671.) The trial court overruled these objections, noting that "I think the record is clear on that." (Dec. 12, 2013 Tr. 671.)

{¶ 164} Pursuant to Crim.R. 30(A), an objection to a jury instruction should be made after the instruction is given but before the jury retires. *State v. Robinson*, 4th Dist. No. 94CA2277 (Oct. 24, 1995), citing *State v. Wolons*, 44 Ohio St.3d 64, 67 (1989). In

addition, an objection to a jury instruction must also be specific. *Id.*, citing *Wolons.* "Where a general objection to 'every part' of an instruction is offered, the specific objection requirement of Crim.R. 30(A) is not met. * * * The purpose of these two requirements is to bring any error to the attention of the trial court so that it may provide a specific curative instruction to the jury before the jury commences deliberations and to provide a complete record for appellate review." *Id.*

{¶ 165} Noncompliance with Crim.R. 30(A) waives all but plain error. *Id.* "A jury instruction does not constitute plain error unless, but for the error, the verdict would have been otherwise." *State v. Philpot*, 10th Dist. No 03AP-758, 2004-Ohio-5063, ¶ 21, quoting *State v. Long*, 53 Ohio St.2d 91 (1978).

{¶ 166} The flight instruction related to appellant's attempt to leave the storage facility after Wilder positioned his cruiser next to appellant's vehicle, displayed his police shield, ordered him to put his hands in the air, and drew his service weapon. We first note that after the jury charge was read, appellant lodged only a general objection to the flight instruction. Further, he does not challenge the substance of the instruction on appeal. Thus, appellant has waived all but plain error.

{¶ 167} On appeal, appellant argues that the flight instruction lacked proper factual support because a reasonable inference was that appellant fled the area because he believed he was going to be robbed or shot, given that Wilder was dressed in plain clothes and was in an unmarked police vehicle when he pointed his service weapon at him. However, given the evidence in the case, a competing reasonable inference existed that appellant fled the scene because he was aware that his storage unit contained cocaine and firearms and he did not want to be apprehended by the police. A flight instruction is proper " 'if sufficient evidence exists in the record to support the charge.' " *State v. Bass*, 10th Dist. No 12AP-622, 2013-Ohio-4503, ¶ 27, quoting *State v. Lozada*, 8th Dist. No. 94902, 2011-Ohio-823, ¶ 17. The instruction informed the jury that it could consider appellant's flight in determining consciousness of guilt. Thus, the jury was free to consider other reasons for appellant's conduct, including, as he now argues, that he fled in fear for his safety. No error, plain or otherwise, occurred in the trial court's giving of the flight instruction.

{¶ 168} Appellant next contends the aiding and abetting instruction was improper because "neither the indictment nor a bill of particulars put [him] on notice of an aiding and abetting theory." (Appellant's Brief, 28.) Appellant argues that appellee did not put forth any evidence of "overt acts by other alleged offenders" and sought the instruction only to counter defense arguments set forth at trial. (Appellant's Brief, 28.)

{¶ 169} We first note that appellant did not object when the trial court initially discussed its proposed jury instruction on aiding and abetting, and appellant only lodged a general, rather than a specific, objection to the instruction after it was provided to the jury. Thus, he has waived all but plain error. *Robinson*, 4th Dist. No. 94CA2277.

{¶ 170} Generally, an accused has aided or abetted an offense if he has supported, assisted, encouraged, cooperated with, advised or incited another person to commit the offense. *See State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. " 'Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' " *State v. Mendoza*, 137 Ohio App.3d 336, 342 (3d Dist.2000), quoting *State v. Stepp*, 117 Ohio App.3d 561, 568-69 (4th Dist.1997).

{¶ 171} R.C. 2923.03(A)(2) provides in pertinent part that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." Further, "[a] charge of complicity may be stated in terms of this section, or in terms of the principal offense." R.C. 2923.03(F).

{¶ 172} In *State v. Perryman*, 49 Ohio St.2d 14 (1976), the Supreme Court of Ohio held at paragraph five of the syllabus that "[w]hen the evidence adduced at trial could reasonably be found to have proven the defendant guilty as an aider and abettor, a jury instruction by the trial court on that subject is proper." In *Perryman*, the bill of particulars filed by the state implicated the defendant as the principal perpetrator of a murder. The state also consistently argued at trial that Perryman was the principal. However, in his defense, Perryman presented witnesses who only implicated him as an aider and abettor.

{¶ 173} Perryman argued that once the state particularized his involvement as a principal, it could not shift its theory of criminal responsibility to that of an aider and abettor. The court held that the indictment as principal performed the function of providing legal notice of the charge to Perryman. *Id.* Accordingly, since Perryman had

raised evidence as to aiding and abetting, a jury instruction as to aiding and abetting was proper. *Id.*

{¶ 174} Since *Perryman* was decided, Ohio appellate courts, including this court, have specifically held that a trial court may properly instruct a jury that the defendant may be found guilty as an aider and abettor even though he was indicted as a principal, rather than under the complicity statute. *See, e.g., State v. Tumbleson*, 105 Ohio App.3d 693 (12th Dist.1995); *State v. Covington*, 10th Dist. No. 02AP-245, 2002-Ohio-7037; *State v. Sims*, 10th Dist. No. 96APA05-676 (Feb. 20, 1997); *State v. Williams*, 10th Dist. No. 93AP-494 (Nov. 18, 1993); *State v. Wetherby*, 5th Dist. No. 12-CA-69, 2013-Ohio-3442.

{¶ 175} In the present case, appellant was detained at the storage facility with Wiggins and Green. Throughout the trial, appellant's cross-examination of appellee's witnesses implied that either Wiggins or Green, or both, may have been responsible for the cocaine, firearms, and cash found in appellant's storage unit. Based on the evidence elicited by appellant, the jury could have reasonably concluded that appellant was acting as an aider or abettor to either Wiggins or Green as principal. Thus, the trial court's jury instruction as to aiding and abetting was proper. No error, plain or otherwise, occurred.

{¶ 176} Finally, appellant contends the trial court should have incorporated his "theory of defense" instruction as part of the jury charge. Appellant cites *State v. Barron*, 170 Ohio St. 267 (1960), for the general proposition that special instructions reduced to writing, which are correct, pertinent to the issues and timely presented, must be included at least in substance in the general charge. *Id.* at 267. Appellant contends his "theory of defense" instruction satisfied this criteria, and the trial court erred in refusing to include it. Appellant maintains that if this instruction had been properly administered, the outcome of the trial would have been different.

{¶ 177} Prior to the commencement of trial, appellant filed a written request that the trial court include the following instruction in its charge to the jury:

> In deciding the credibility of law enforcement officers, you may consider whether or not they performed a thorough and complete investigation. If you find they failed to do [so], you may consider this in your evaluation of their credibility.

(Dec. 5, 2013 Request for Theory of Defense Instruction, 4.)

{¶ 178} As noted above, the trial court refused to provide the instruction, finding it to be in the nature of an argument that defense counsel could raise during closing arguments. We review the trial court's refusal to give a requested jury instruction for an abuse of discretion under the facts and circumstances of the case. *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 29, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 59.

{¶ 179} Appellant has failed to provide any specific legal authority establishing that a trial court must instruct the jury as to the alleged inadequacy of a police investigation. Further, the jury charge included instructions regarding the jury's responsibility to evaluate and determine witness credibility. We presume the jury followed this instruction. *McKinney* at ¶ 15. Moreover, appellant has failed to provide any argument as to why the outcome of the trial would have been different had the proposed instruction been given. Throughout his cross-examination and during closing argument, appellant emphasized to the jury his theory that the law enforcement officers involved in the present case did not perform a thorough and complete investigation. Accordingly, we cannot find that the trial court abused its discretion in failing to provide the proposed instruction.

{¶ 180} The tenth assignment of error is overruled.

### D. Eleventh Assignment of Error—Sentencing

{¶ 181} In his eleventh assignment of error, appellant challenges the trial court's imposition of consecutive sentences on his cocaine possession and WUD convictions. Appellant contends the record does not support the imposition of consecutive sentences, and the trial court did not give "detailed information" to support the consecutive sentences. (Appellant's Brief, 29.) In support of his arguments, appellant directs this court to R.C. 2929.14(C)(4).

{¶ 182} Because appellant did not challenge the trial court's imposition of consecutive sentences at his sentencing hearing, we may reverse appellant's sentence only if it constitutes plain error. *State v. Ayers*, 10th Dist. No. 13AP-371, 2014-Ohio-276, ¶ 7.

{¶ 183} Pursuant to R.C. 2929.14(C)(4), when a trial court sentences a defendant to consecutive sentences for multiple offenses, it must make specific findings of fact. In relevant part, the statute provides:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction * * * or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 184} The trial court is required under R.C. 2929.14(C)(4) to make three findings before imposing consecutive sentences: " '(1) that consecutive sentences are necessary to protect the public from the future crime or to punish the offender; (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of the subsections (a), (b), or (c) apply.' " *Id.* at ¶ 12, quoting *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 76.

{¶ 185} When imposing consecutive sentences, a trial court is not required to provide reasons for its findings; rather, a trial court is only required to make the findings required by R.C. 2929.14(C)(4). *State v. Zonars*, 10th Dist. No. 13AP-735, 2014-Ohio-

2023, ¶ 32, citing *State v. Wilson*, 10th Dist. No. 12AP-551, 2013-Ohio-1520, ¶ 19. *See also State v. Sullivan*, 10th Dist. No. 11AP-414, 2012-Ohio-2737, ¶ 24 (R.C. 2929.14(C)(4) "requires *findings* before imposing consecutive terms, but not *reasons* for imposing said terms." (Emphasis sic.)

{¶ 186} At appellant's sentencing hearing, the trial court made the findings required by R.C. 2929.14(C)(4). The court specifically found that "the consecutive sentence is necessary to protect the public from future crime and that it is not disproportionate to the seriousness of the conduct that has been involved here and to the danger that you pose to the public based on all the facts of this case and that your history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by you." (Jan. 9, 2014 Tr. 29.) Further, contrary to appellant's contention, the record supports the trial court's findings. Appellant was apprehended in possession of a significant amount of cocaine and two operable firearms. Appellant, in his early twenties at the time he committed the offenses, already had an extensive criminal history. In addition, he committed the instant offenses while on probation.

{¶ 187} Because the record establishes the trial court made the findings required by R.C. 2929.14(C)(4) prior to imposing consecutive sentences on appellant's multiple offenses, and because the record supports those findings, no error, plain or otherwise, occurred.

{¶ 188} Appellant's eleventh assignment of error is overruled.

## IV. CONCLUSION

{¶ 189} Having overruled appellant's 11 assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN and O'GRADY, JJ., concur.

_____